A99A0798. GREENE COUNTY v. NORTH SHORE RESORT AT LAKE OCONEE, LLC.
(517 SE2d 553)

ELDRIDGE, Judge.

North Shore Resort At Lake Oconee, LLC ("North Shore"), plaintiff-appellee, owns and operates a business located on the shore of Lake Oconee in Greene County, defendant-appellant, and a resort business has operated there since 1988, when the business was known as Carey Station Resort, the predecessor in title. North Shore bought Carey Station Resort as a going business and property in 1996, changing its name to North Shore.

North Shore is located within an area presently zoned LR-2 pursuant to the Greene County regulations, which had an effective date of April 19, 1989. However, the date of passage of the manufactured home amendment was August 8, 1990. The entire Greene County regulation pertaining to zoning was not stipulated but was placed in evidence. In fact, even the stipulation of "LR-2" does not reveal what other uses are permitted under such zoning, but the LR-1 and LR-2 regulations do.

The August 8, 1990 amendment of the 1984 Land Development Regulations was also placed in evidence, along with the definitions section and the LR-1 and LR-2 zoning provisions. "Dwelling, One Family" is defined as "a detached building designed for or occupied by one family." "Dwelling Unit" is defined as "one or more rooms with kitchen facilities designed as a unit for occupancy by one family for cooking, living and sleeping purposes." "Family" is defined as "one or more persons occupying a single dwelling unit, provided that unless all members are related by blood or marriage, no such family shall contain over five (5) persons, but further provided that domestic servants employed on the premises may be housed on the premises without being counted as a family or families." "Building" is defined as "[a]ny structure intended for shelter, housing, or enclosure of persons, animals, or chattels." "Park trailer" is not defined; however, "travel trailer" is defined as "a vehicle portable structure built on a chassis, designed to be used as a temporary dwelling for travel and recreational purposes, having a body width not to exceed eight (8) feet." "Structure" is defined as "anything constructed or erected with a fixed location on the ground. Among other things, structures include buildings, mobile homes [('manufactured homes')], walls, fences, billboards, and poster panels."

At the time Carey Station Resort was constructed in 1988, "[m]obile [h]ome" was defined as "a detached residential dwelling unit designed for transportation after fabrication on streets or highways on its own wheels or a flatbed or other trailer, and arriving at the site where it is to be occupied as a dwelling complete and ready for occupancy except for minor and incidental unpacking and assembly operations, location on jacks or other temporary or permanent foundations, connections to utilities, and the like. A travel trailer is not to be considered a mobile home."

On March 19, 1997, Vivian Breeding, Director of Greene County Planning & Zoning, notified North Shore that: (1) the property was within LR-2 zoning; (2) LR-2 zoning permits use of the property as a campground; (3) the only limitation on the number of campsites that can be developed on the property is availability of septic tanks to service the sites; and (4) the sites may include recreational vehicle pads. Mobile home parks are permitted within LR-2, and one mobile home

may be placed on each separately owned land, other than a mobile home park.

On July 15, 1997, Greene County advised North Shore that Greene County considered that it was operating a "Manufactured Home Park," i.e., mobile home park, within the meaning of the county regulations; that it was subject to regulation as such; and that evidence of approved plats for "Carey Station Resort" could not be found. Greene County based such position on the contention that: (1) a recreational vehicle, "Park Trailer," is actually a "Manufactured Home" and not a "Travel Trailer"; and (2) a "Park Trailer" is a long-term, single family dwelling.

The only portion of the Greene County amended regulations stipulated was Paragraph 7.2 (v) defining "Manufactured Home":

> A structure transportable in one (1) or more sections, designed to be used for long term occupancy as a single-family dwelling. Such a dwelling shall be constructed in accordance with the Federal Manufactured Home Construction and Safety Standards, which came into effect June 15, 1976, and shall bear an insignia issued by the U. S. Department of Housing and Urban Development (HUD). The term "manufactured home" shall replace the term "mobile home" wherever the latter term is found in the aforesaid Code.

North Shore contends that park trailers are recreational vehicles ("RVs"), including pop-up campers, fifth wheel straight trailers/park trailers, and motor homes. RVs are registered with the Department of Motor Vehicles as recreational vehicles. Only RVs are allowed into North Shore.

A park trailer has a fifth wheel for hauling and is designed for greater mobility and movement than a manufactured home, but it is left on a pad on its wheels for a longer period of time than other RVs. A park trailer must be removed from the premises for two weeks each year, which demonstrates that it remains readily movable. A park trailer is not manufactured to HUD specifications for a manu-factured home and has a maximum area of 400 square feet. The wheels are not removed from the chassis of a park trailer, as are wheels from a manufactured home, and a park trailer is not placed on a permanent foundation.

The campsites within North Shore are subject to certain declara-tions of covenants, conditions, and restrictions for the North Shore Resort at Lake Oconee ("declarations"), which are recorded in the deed records of the Superior Court of Greene County. The declara-tions provide that the property shall be used solely for recreation, including camping, picnicking, hiking, boating, fishing, sports and

other recreational uses. A lessee is specifically and expressly prohibited from occupying or using any portion of the property for residential purposes or to claim residency in Greene County, Georgia, based upon such use. No permanent dwelling may be placed on the property; no lessee can occupy the property on a permanent basis; and the property must be vacated for two weeks out of each calendar year. In addition to the declaration prohibitions, the lease on all property provides that (1) a campsite may be used only for vacation purposes; (2) no permanent dwellings may be erected on any site; and (3) the site cannot be a principal dwelling or basis for a residency claim. Lessees are subject to the covenants and any other rules and regulations of North Shore, which prohibit storage buildings and propane tanks installed on a campsite. Thus, lessees must agree to temporary occupancy at North Shore in temporary park trailers.

On September 15, 1997, Greene County again notified North Shore that it was violating the county ordinance by operating a mobile home park.

North Shore intended to lease the sites for placement of "Park Trailers," and had already leased some sites for the placement of "Park Trailers." Because of the position of Greene County that park trailers are manufactured homes and that North Shore must obtain a permit for a manufactured home park to lease pads for park trailers, North Shore was unable to lease the pads and was uncertain of its rights.

On October 18, 1997, North Shore filed a complaint seeking injunctive relief against Greene County and seeking a temporary restraining order ("TRO"). On February 5, 1998, the trial court denied the TRO. On April 28, 1998, North Shore amended its complaint to seek a declaratory judgment.

On September 18, 1998, after a hearing, the trial court entered a declaratory judgment that declared that a park trailer is not a manufactured home and that a park trailer is not subject to regulation by Greene County as a manufactured home. The trial court filed no findings of fact and conclusions of law with the judgment; therefore, on October 5, 1998, Greene County filed a motion requesting that the trial court make findings of fact and conclusions of law. On October 8, 1998, the trial court denied such request. On Monday, October 19, 1998, Greene County filed its notice of appeal of the judgment and of the denial of its motion for findings of fact and conclusions of law. *Held*:

1. Greene County contends that the trial court erred in failing to rule on the admissibility of expert testimony from plaintiff's witness, Wright, regarding whether he was, in fact, an expert witness or whether his opinion was that of a lay person and on the relevancy of such opinion. We do not agree.

This was a non-jury trial where the trial court sat as trier of fact. The record is silent where the trial court did not rule on the record as to objections on admissibility of evidence and made no findings of fact indicating how the trial court ruled on such evidence.

"Where evidence is heard by the judge alone and without the intervention of a jury, it will be presumed that the judge considered only legal and admissible evidence, unless the record clearly indicates that the contrary is true. [Cit.]" *Barger v. Barger*, 238 Ga. 334, 335-336 (9) (232 SE2d 567) (1977). The trial court, sitting without a jury, can eliminate the wheat from the chaff with reference to irrelevant and immaterial evidence, and it is presumed that in consideration of the evidence, legal testimony was selected. The judgment will not be reversed where there is legal evidence to support it. *In the Interest of M. A. C.*, 244 Ga. 645, 655 (4) (261 SE2d 590) (1979); *Nelms v. Dorsey*, 168 Ga. App. 452, 454 (2) (309 SE2d 426) (1983). Where the trial court alone tries the case, the presumption is that the judgment was rendered only upon competent and legal evidence before him, and even if illegal evidence was admitted, it does not require a new trial. *United Rentals Systems v. Safeco Ins. Co.*, 156 Ga. App. 63, 65-66 (1) (273 SE2d 868) (1980); *Nelliger v. Atlanta Baggage & Cab Co.*, 109 Ga. App. 863, 865-866 (3) (137 SE2d 566) (1964). Thus, this Court presumes the correctness of the trial court's judgment without inferring reversible error absent evidence of harm. *Owens v. Generali — U. S. Branch*, 224 Ga. App. 290, 295 (4) (480 SE2d 863) (1997).

2. Greene County contends that the trial court abused its discretion in denying its request to make findings of fact and conclusions of law in support of its judgment. We do not agree.

OCGA § 9-11-52 provides for findings of fact and conclusions of law when the trial court tries a case without a jury. If either party *prior* to judgment or ruling on interlocutory injunctions or in all non-jury trials makes a motion for findings of fact and conclusions of law to be made by the trial court, then the trial court shall "find the facts specially and shall state separately its conclusions of law," because such provision is mandatory under the 1987 amendment upon timely request made on the record prior to judgment. OCGA § 9-11-52 (a); *Poor v. Leader Fed. Bank for Savs.*, 221 Ga. App. 889 (1) (473 SE2d 563) (1996); see generally *Motes v. Stanton*, 237 Ga. 440, 441 (228 SE2d 831) (1976); *Githens v. Githens*, 234 Ga. 715, 716 (217 SE2d 291) (1975); *Frasier v. Dept. of Human Resources*, 159 Ga. App. 1 (282 SE2d 667) (1981). "The purpose of findings of fact is threefold: [(1)] as an aid to the trial judge's process of adjudication; [(2)] for purposes of res judicata and estoppel by judgment; and [(3)] as an aid to the appellate court on review." (Citation and punctuation omitted.) *Gen. Teamsters Local &c. 528 v. Allied Foods*, 228 Ga. 479, 480 (186 SE2d

527) (1971); *Spivey v. Mayson*, 124 Ga. App. 775 (186 SE2d 154) (1971); accord *Coleman v. Coleman*, 238 Ga. 183 (232 SE2d 57) (1977). Absent a timely request prior to the entry of the order or judgment, the trial court does not err in failing to make findings of fact and conclusions of law as a part of the judgment. See *Middlebrooks v. Fleet Finance*, 217 Ga. App. 263 (2) (456 SE2d 627) (1995); *Cage v. Chase Home Mtg. Corp.*, 212 Ga. App. 861 (1) (443 SE2d 504) (1994); *Burks v. First Union Mtg. Corp.*, 209 Ga. App. 41 (1) (432 SE2d 822) (1993).

Since Greene County requested findings of fact and conclusions of law only *after* the entry of judgment, it was within the discretion of the trial court whether to grant or deny such request. OCGA § 9-11-52 (c); *Bagley v. Robertson*, 265 Ga. 144, 145-146 (454 SE2d 478) (1995). Where the case is complex and has an extensive record, it would be an abuse of discretion to deny such post-judgment motion when made at the time judgment was entered, because such refusal to make specific factual findings makes appellate review impossible. *Gold Kist v. Wilson*, 220 Ga. App. 426, 427 (1) (469 SE2d 504) (1996); *Zumpano Enterprises v. Ga. Tile Distrib.*, 200 Ga. App. 563, 564 (408 SE2d 813) (1991). However, such was not the case here, where the issues and the record were both uncomplicated. *Gold Kist v. Wilson*, supra at 426.

> A motion made under [OCGA] § 9-11-52 (c) is, in essence, a vehicle to allow a party to extend the time for a trial court to amend its findings beyond the end of the term. Neither [OCGA] § 9-11-52 (c) nor any other section of the Civil Practice Act changes the rule that a trial judge has the inherent power during the same term of court in which the judgment was rendered to revise, correct, revoke, modify or vacate the judgment, even upon his own motion. . . . A superior court retains *plenary* control over judgments entered during the term at which they are entered, and in the exercise of a sound *discretion* may [amend them by adding omitted findings of fact and conclusions of law], and such discretion will not be controlled unless *manifestly abused*. . . . [T]his court will not reverse his decision unless such discretion is manifestly abused.

(Citations and punctuation omitted; emphasis in original.) *Bagley v. Robertson*, supra at 145-147. There being no showing of a manifest abuse of discretion, the trial court's ruling is affirmed.

3. Greene County contends that the trial court erred in finding that "park trailers" are not "manufactured homes" under the Greene County Regulations. We do not agree.

In 1990, Greene County, in developing its new definition of manufactured homes, incorporated by reference Federal Manufactured Home Construction & Safety Standards. 24 CFR § 3282.8 governs "manufactured homes."[1] However, "recreational vehicles" are expressly excluded from "manufactured homes," and are defined in the regulations as:

> (1) [b]uilt on a single chassis; (2) 400 square feet or less when measured at the largest horizontal projection; (3) [s]elf-propelled or permanently towable by a light duty truck; and (4) [d]esigned primarily not for use as a permanent dwelling, but as temporary living quarters for recreational, camping, travel, or seasonal use.

The Greene County Regulations, in this definition of "manufactured home," rely upon such Federal Manufactured Home Construction & Safety Standards, which came into effect June 15, 1976. See 24 CFR § 3282; Greene County Regs. Par. 7.2 (v). Thus, Greene County incorporated by reference "recreational vehicles" as excluded from its definition of "manufactured homes," because the federal standards, used in the definition of "manufactured homes," specifically exclude "recreational vehicles" from being subject to such standards. 24 CFR § 3282. The LR-2 zoning requires of an individual "manufactured home" that "[t]he unit is supported under all exterior walls by a permanent foundation and the undercarriage is completely enclosed," but also provides "that sites may include Recreational Vehicle pads." This regulation is inconsistent unless "recreational vehicles" are not treated as "manufactured homes."

Thus, the regulations are ambiguous and in conflict on their face, because the definition of "manufactured home" is so overly broad that it seems to include all "travel trailers" and "recreational vehicles" within its definition, unless the regulations are read to specifically exclude them. However, at the same time, the definition of "travel trailers" excludes itself specifically from "manufactured homes," and the definition of "travel trailers" is broad enough to include all "recreational vehicles." Further, LR-2 requires that "manufactured homes" have a permanent foundation and that the under-

---

[1] Since the property was purchased in 1988, and the regulations were amended in 1989 and 1990, North Shore could have asserted a vested interest and substantial reliance upon the 1984 regulations so as to be treated as a grandfathered, nonconforming use under later regulations, provided that it made out a factual predicate for such vested right. See *WMM Properties v. Cobb County*, 255 Ga. 436, 438 (1) (c) (339 SE2d 252) (1986); *Barker v. Forsyth County*, 248 Ga. 73, 76 (281 SE2d 549) (1981); *Spalding County v. East Enterprises*, 232 Ga. 887 (209 SE2d 215) (1974); *DeKalb County v. Chapel Hill*, 232 Ga. 238 (205 SE2d 864) (1974).

carriage be covered, but that a "recreational vehicle" may sit only on a "recreational vehicle pad," because the "recreational vehicle" is intended to be mobile. A "manufactured home" is a structure, but a "structure" is anything "constructed or erected with a *fixed location on the ground*, or attached to something having a fixed location to the ground." (Emphasis supplied.) However, a "travel trailer" is "a vehicular portable structure built on a chassis, designed to be used as a temporary dwelling for travel and recreational purposes, having a body width not exceeding eight (8) feet," for normal highway travel. (Emphasis supplied.) Clearly, a "travel trailer" is not intended by the regulations to be treated as a "manufactured home," because it is both designed and used for purposes requiring mobility, i.e., used temporarily for travel, recreation, camping, or seasonal use.

A clear, plain-meaning, unambiguous ordinance is not to be construed by the court; however, where the ordinance is in fact, ambiguous, so as to appear to be in conflict with its own provisions, then the court will construe the ordinance to determine its true intent. *City of Jesup v. Bennett*, 226 Ga. 606, 608-609 (2) (176 SE2d 81) (1970). The courts, in interpreting ordinances, must look for the intent of the governing body and construe the ordinance to effectuate that intent. All words, except words of art, shall be given their ordinary signification. *City of Roswell v. City of Atlanta*, 261 Ga. 657 (1) (410 SE2d 28) (1991).

> "In construing an ordinance or resolution of a governmental unit, if the language is susceptible of more than one construction, that construction is preferred which will render it valid rather than invalid." Language in an ordinance will be given a reasonable and sensible interpretation in order to carry out legislative intent and render an ordinance valid.

(Citations omitted.) *Mayor &c. of Hapeville v. Anderson*, 246 Ga. 786, 787 (272 SE2d 713) (1980).

> But where an ambiguity exists either because of uncertainty in the meaning of words, conflicts with previous laws, or conflicts between different clauses in the same statute, courts should look beyond the verbiage and discover the intent. While all parts of the statute should be preserved, yet a cardinal rule of construction is that the legislative intent shall be effectuated, even though some verbiage may have to be eliminated. The legislative intent will prevail over the literal import of the words.

(Citation and punctuation omitted.) *Jones v. City of College Park*, 223 Ga. 778, 780-781 (158 SE2d 384) (1967). "It is the duty of the court in

construing an ambiguous statute to give it a construction, if the language permits, that will sustain the Act, rather than a construction that will render it invalid." Id. at 782. "All [ordinances] are presumed to be enacted . . . with full knowledge of the existing condition of the law and with reference to it; [ordinances] are therefore to be construed in connection and in harmony with the existing law." (Citation and punctuation omitted.) *McPherson v. City of Dawson*, 221 Ga. 861, 862 (148 SE2d 298) (1966). Therefore, an ordinance "must be viewed so as to make all its parts harmonize and to give a sensible and intelligent effect to each part." *Houston v. Lowes of Savannah*, 235 Ga. 201, 203 (219 SE2d 115) (1975); accord *Osborn v. State*, 161 Ga. App. 132 (291 SE2d 22) (1982). This can be done here only if "travel trailers" and "recreational vehicles" are excluded from the definition of "manufactured homes."

By objective standards, a "travel trailer" is intended to be a vehicular portable trailer built on a chassis that is designed and intended to be capable of frequent moves, with a maximum width of eight feet for highway travel, which is within normal highway width limitations, and is not designed to be fixed to the ground by a foundation, but to sit on a recreational vehicle pad so that it can be easily moved. OCGA § 32-6-23. "Manufactured homes" come in widths from eight to sixteen feet wide; two can be joined to form a "double wide." The definition also contains a subjective standard that is entirely dependent upon the use, i.e., "to be used as a temporary dwelling." A reasonably prudent person would use as a temporary dwelling what was designed for temporary use, although such temporary dwelling also may be used as "a building designed or used for permanent living quarters for one or more families or individuals." Therefore, the objective design of the trailer for normal use controls, rather than the subjective *intent* of the user. Thus, travel and recreational design determines the temporary nature of the trailer, notwithstanding that there may be those individuals who may use it as a permanent dwelling. Since the definition of "manufactured home" incorporates by reference the federal standards for "manufactured homes," then it also incorporated by reference that portion of the federal regulations defining "recreational vehicles." 24 CFR § 3282.8 (g). Such definitions are not in conflict with the definition of "travel trailer," which is more specific, i.e., (1) "[b]uilt on a single chassis"; (2) "400 square feet or less"; (3) "permanently towable by a light duty truck"; and (4) "[d]esigned primarily not for use as a permanent dwelling but as a temporary living quarters for recreational, camping, travel, or seasonal use."

"Travel trailers" or "recreational vehicles" define and describe a "park trailer," because a "park trailer" is 400 square feet or less, is pulled by a pickup truck, and is designed to be moved from the prem-

ises once a year for at least two weeks; this does not describe a "manufactured home." A "recreational vehicle" or "travel trailer" must have a registration and license tag. OCGA § 40-2-20 (a). Since a "manufactured home" is not expected to be moved on the highway except for installation, then only the moving trucker must have a special license for the move. OCGA § 40-2-38 (b). "Mobile (manufactured) homes" require a specially issued certificate of title. OCGA § 40-3-31.1. Pages 205, 206, and 207 of Exhibit 10 show photographs of typical park trailers situated on recreational vehicle pads; pages 203 and 206 of Exhibit 10 show photographs of a motor home/recreational vehicle situated on a recreational vehicle pad, which is a self-propelled recreational vehicle. The only real differences between a motor home and a park trailer are that a motor home is self-propelled and has a front and rear axle.

The leases, rules, regulations, and covenants for North Shore prohibit a park trailer from being used as a permanent dwelling, and to ensure that it is used only as a temporary dwelling, the lessee is required to move the park trailer off North Shore for at least two weeks each year. Despite the subjective intent of the lessee/park trailer owner, such recreational vehicle or travel trailer cannot be a permanent home, because it must be removed once a year for at least two weeks, when it is mobile. Since "mobile homes" under the 1990 regulations are now called "manufactured homes," then park trailers, as travel trailers or recreational vehicles, are not manufactured homes. Likewise, the new definition of "manufactured homes" incorporated by reference federal standards for manufactured homes as part of its definition. Such federal standards expressly define and exclude recreational vehicles, and park trailers come within such exclusionary definitions of "recreational vehicles" and "travel trailers." For the foregoing reasons the trial court correctly found that a park trailer, i.e., a travel trailer or recreational vehicle, was excluded from the restrictions on manufactured homes in its declaratory judgment.

*Judgment affirmed. Pope, P. J., and Smith, J., concur specially.*

POPE, Presiding Judge, concurring specially.

I agree with all that is said in Divisions 1 and 2, but write separately as to Division 3. At issue in this case is whether North Shore is subject to regulation as a manufactured (mobile) home park or whether it should be classified as a "campground." Resolution of this issue depends on whether "park trailers" should be classified as manufactured homes under the applicable Greene County regulations. As a practical matter, park trailers seem to fall somewhere between manufactured homes and recreational vehicles in terms of their components. The Greene County regulations do not contain a definition

of "park trailers" or "recreational vehicles," but do define a manufactured home as

> a structure transportable in one (1) or more sections, designed to be used for long term occupancy as a single-family dwelling. Such a dwelling shall be construed in accordance with the Federal Manufactured Home Construction and Safety Standards, which came in to effect June 15, 1976, and shall bear an insignia issued by the U. S. Department of Housing and Urban Development (HUD). . . .

North Shore presented evidence in this case that the "park trailers" located at its facility were not designed or manufactured for long-term occupancy, were not constructed in accordance with Federal Manufactured & Home Construction Standards and did not bear the HUD insignia. North Shore presented additional evidence that the park trailers located at its facility were built to specifications promulgated by the Recreational Park Trailer Industry and that it requires the trailers in its facility to carry a sticker signifying compliance with those standards. Moreover, the park trailers at North Shore's facility are registered as recreational vehicles with the Department of Motor Vehicles. Contrary to Greene County's argument, the fact that the evidence also showed that a park trailer may have many of the same amenities as a manufactured home does not make it one.

I am authorized to state that Judge Smith joins in this special concurrence.

DECIDED MAY 10, 1999 —<br>RECONSIDERATION DENIED MAY 26, 1999.

*Decker & Hallman, David C. Moss*, for appellant.

*Weinstock & Scavo, Steven M. Winter, Louis R. Cohan*, for appellee.

