A02A1100, A02A1101. COMMERCIAL CASUALTY INSURANCE COMPANY OF GEORGIA v. MARITIME TRADE CENTER BUILDERS; and vice versa.
(572 SE2d 319)

BARNES, Judge.

These cases arise from a performance bond in a subcontractor's construction contract. The surety, Commercial Casualty Insurance Company ("CCIC"), contends on appeal that the general contractor, Maritime Trade Center Builders ("MTCB"), failed to give sufficient notice to trigger liability under the bond. In a cross-appeal, MTCB contends that the trial court awarded it insufficient damages after a bench trial. For the reasons that follow, we affirm.

MTCB served as the project manager and trade contractor for the Georgia Maritime and International Trade Center construction, built on Hutchinson Island in Chatham County. MTCB entered into a subcontract for $288,356 with IL Construction Company ("IL") for certain concrete work. Pursuant to the terms of the subcontract, IL obtained a performance bond for $288,356 with CCIC on March 11, 1998.

Relations between MTCB and IL deteriorated, and eventually, in May 1999, IL sued MTCB for money it claimed was due under the subcontract. MTCB answered, denied liability, and counterclaimed against IL for breach of contract, bad faith, and stubborn litigiousness. MTCB also counterclaimed against CCIC, contending the

surety was jointly and severally liable under the performance bond. CCIC answered the counterclaim, denying liability and raising as a defense MTCB's "failure to fulfill conditions precedent to the viable assertions of their claims," among other things.

Discovery disputes ensued. The trial court ordered IL to supplement some of its answers to MTCB's interrogatories within a certain time frame. IL failed to do so and filed a dismissal without prejudice, to which MTCB objected. The trial court sustained the objection and held that MTCB's counterclaim remained pending. The court then granted MTCB's motion for sanctions against IL for failing to supplement its interrogatory responses as ordered and declared IL to be in default on MTCB's counterclaims for breach of contract and stubborn litigiousness. After the parties filed additional pleadings, the trial court awarded MTCB attorney fees and expenses of $13,319.59 for prosecuting the motions to compel and for sanctions.

Both MTCB and CCIC subsequently moved for summary judgment on MTCB's claim against the surety under IL's performance bond. After a hearing on contract damages and attorney fees, the trial court denied CCIC's motion for summary judgment on the issue of coverage under the performance bond, granted MTCB's motion for summary judgment, and awarded $196,302 to MTCB against IL and CCIC, jointly and severally.

*Case No. A02A1100*

1. CCIC contends on appeal that it was not liable on the performance bond because MTCB failed to give proper notice of IL's default, as required by the terms of the bond. MTCB contends that it gave proper notice pursuant to the bond's terms, and that it was also entitled to recover under the terms of its subcontract with IL, which was incorporated into the bond by reference. The performance bond itself details certain actions MTCB (the Owner) must take to declare IL (the Contractor) in default and thus trigger the surety's obligations under the bond.

> 3 If there is no Owner Default, the Surety's obligation under this Bond shall arise after: 3.1 The Owner has notified the Contractor and the Surety . . . that the Owner is considering declaring a Contractor default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an

agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and 3.2 The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and 3.3 The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the owner.

The bond also incorporates by reference the contract between MTCB and IL. Article 13 of that contract specifies the actions and remedies available to MTCB if IL fails to perform properly or promptly under the contract, or fails to pay its materialmen. Those remedies include supplementing IL's work with labor, materials, and equipment after 48 hours notice to IL, and taking charge of IL's work on the project 48 hours after giving the subcontractor written notice it was in default. Subsection E of Article 13 addresses the surety's role if MTCB exercises any remedies under the article, providing:

The remedies provided the Trade Contractor in this Article 13 . . . shall be cumulative, and not exclusive, of all other remedies which the Trade Contractor may have for breach of this Agreement by the Subcontractor, or as a result of the Subcontractor's failure to perform any of the covenants of this Agreement. All losses, damages, and expenses, including attorneys' fees incurred in the prosecution or defense of any action, arbitration or suit, trial or appeal, enforcement of any judgment, bankruptcy or insolvency proceeding, or any subsequent proceeding or appeal from any order or judgment entered therein, incurred by or resulting to the Trade Contractor on the above account, shall be borne by and charged against the Subcontractor and shall be damages for breach of this Agreement. *Trade Contractor may recover same from the Surety issuing the bonds referenced in Article 16 hereof, and both the Subcontractor and its Surety agree to pay Trade Contractor for such losses, damages, expenses and attorneys' fees. . . .*

(Emphasis supplied.)

MTCB sent four documents to CCIC regarding IL's poor performance. Its project engineer returned a form to CCIC on September 3,

1998, reporting on IL's contract progress. On the form, the engineer noted that the anticipated date of contract completion was October 25, 1998, that IL was not paying labor and material bills, and that its work was not progressing satisfactorily. Under "Remarks," MTCB's engineer wrote: "MTCB is paying vendors with joint checks now. MTCB is now supplementing field personnel, to run IL Construction crews. IL Construction is so far behind schedule MTCB has added crews to complete job. MTCB had IL Construction's field superintendent removed from job. Work has been unacceptable."

MTCB returned another form to CCIC on November 24, 1998, again noting that IL was not paying labor and material bills, and that its work was not progressing satisfactorily, but also indicating that there is no anticipated date of completion because MTCB had to "do a reduction of scope." Under "Remarks," the project engineer noted:

> Contractor not paying bills. Had vendors coming in and requesting joint checks. Field personnel checks bouncing at bank. Could not meet payroll. Job has been behind schedule. Field personnel not properly skilled workmen. Have damaged equipment. Contractor has had to pay equipment bills and give bonus to help meet payroll.

Finally, on March 8, 1999, and again on March 18, 1999, MTCB's project engineer sent the following identical letters to CCIC:

> Maritime Trade Center Builders (MTCB) is a Trade Contractor on the construction of the Georgia Maritime Trade Center in Savannah, GA. On February 10, 1998, MTCB entered into a subcontract agreement with Instant Laborers, Inc. dba IL Construction (IL) to construct certain parts of the work, namely pile caps and grade beams. IL began work on February 21, 1998 and was scheduled to finish on May 1, 1998. They actually completed their ceased work in Zones 1 thru 9 (Phase 1) on November 27, 1998. During the course of the work, IL failed to pay for certain leased and/or rented equipment and MTCB was ultimately forced to furnish materials, equipment and labor to assist IL to complete the work and mitigate delays to follow on work. It is our intent to use the current retainage amount to offset the outstanding debts. Please be advised that Maritime Trade Center Builders will expect Commercial Casualty Insurance Company of Georgia to be responsible for any amount in excess of the retainage. We are anxious to resolve this matter and will appreciate the opportunity to discuss the issues at your earliest convenience.

The project engineer testified that CCIC never responded to any of these forms or letters.

Because the bond incorporated the subcontract by reference, we must construe them together. *McArthor v. McGilvray*, 1 Ga. App. 643, 646 (57 SE 1058) (1907). In doing so, we apply the general rules of contract construction and first consider whether the language employed by the parties in the contract is plain, unambiguous, and capable of only one reasonable interpretation. *R. J. Griffin & Co. v. Continental Ins. Co.*, 230 Ga. App. 822, 823 (497 SE2d 586) (1998). The obligation of a surety is construed strictly in the surety's favor. *Tucker Materials v. Devito Contracting &c.*, 245 Ga. App. 309, 310 (535 SE2d 858) (2000).

The bond itself contains a detailed notice provision in the event of a default, but does not address the contingency of the contractor supplementing the subcontractor's work before it defaults. The subcontract, on the other hand, contains only a 48-hour notice requirement to the subcontractor in the event the contractor decides to supplement the subcontractor's labor and materials or decides to declare the subcontractor in default, and no provision about providing notice to the surety. The subcontract further specifies that the surety agrees to pay the contractor any losses, damages, expenses, and attorney fees incurred because of the subcontractor's breach or failure to perform. The plain language of the executed documents leads to only one reasonable interpretation, that the contractor was not required to give the surety notice before supplementing the subcontractor's labor or materials to collect under the performance bond. Therefore, the trial court did not err in granting summary judgment to MTCB and denying summary judgment to CCIC on the issue of coverage under the bond.

### *Case No. A02A1101*

2. MTCB claims on cross-appeal that the trial court's damages award of $196,302 following a bench trial on damages was clearly erroneous because its evidence of damages was unrebutted. CCIC responds that the trial court's award should be affirmed if it is supported by any evidence, and that it rebutted MTCB's evidence of damages.

"A trial judge sitting without a jury is entitled to have his judgment considered as a verdict by a jury, and if there is any evidence to support the finding, it should be affirmed. Also the evidence must be construed most strongly in favor of the prevailing party. [Cit.]" *Anchor Sign Co. &c. v. ITT Terryphone Corp.*, 138 Ga. App. 742, 743 (2) (227 SE2d 492) (1976). MTCB did not ask the trial court to make findings of fact and conclusions of law pursuant to OCGA § 9-11-52

(a), one purpose of which is to aid the appellate court on review. *Greene County v. North Shore Resort &c.*, 238 Ga. App. 236, 240 (2) (517 SE2d 553) (1999).

The trial judge in this case heard testimony from MTCB's project engineer that the company incurred $199,785.41 costs in completing IL's contract, and lost an additional $19,978.54 overhead and $10,988.20 profit it would have earned had IL performed the contract, for a total loss of $230,752.15, from which the subcontract balance of approximately $30,000 should be subtracted. MTCB introduced into evidence numerous reports generated by its accounting system that tracked these costs. CCIC cross-examined the engineer and brought out the fact that MTCB paid IL all but ten percent of the mandatory retainage, which included payment for work IL did not perform. One of MTCB's lawyers testified that it incurred approximately $108,000 in attorney fees, of which the court had already awarded $13,319. The trial court also considered the entire record, which includes numerous documents and the depositions of IL's CEO and vice-president, much of which addressed costs.

Thus the record contains much information regarding costs and damages. In the absence of specific findings of fact and conclusions of law, we cannot say that the trial court's decision is unsupported by any evidence. Accordingly, the damages award to MTCB is affirmed.

*Judgments affirmed in both appeal and cross-appeal. Ruffin, P. J., and Pope, Senior Appellate Judge, concur.*

DECIDED SEPTEMBER 24, 2002 —
RECONSIDERATION DENIED OCTOBER 9, 2002.

*Thompson & Slagle, Jefferson B. Slagle, Alfred A. Malena, Jr., Wayne W. Dempsey, Jr.*, for appellant.
*Alston & Bird, David R. Hodnett, Calvin T. Vick, Jr.*, for appellee.